ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| **ADRIENNE FONT WELLS**<br>**ADREA FONT WELLS**<br><br>Apelada<br><br>v.<br><br>**DIANA RAMOS OCTAVIANI**<br>**por sí y haciendo negocio**<br>**como DIANA FONT**<br>**ARTWORK**<br>**Lcda. MARIA DEL C.**<br>**MULERO FERNÁNDEZ,**<br>**COCHERA SAN FRANCISCO,**<br>**LLC., como sucesor de LA**<br>**COCHERA SE;**<br>**CONSEJO DE TITULARES Y**<br>**LA JUNTA DE DIRECTORES**<br>**DEL CONDOMINIO; LA**<br>**COCHERA SAN FRANCISCO,**<br>**ALIDA FONT POLO**<br><br>Apelantes | TA2025AP00592 | **APELACION**<br>procedente del Tribunal de Primera Instancia, Sala Superior de **San Juan**<br><br>Civil Núm.:<br>**SJ2018CV05003**<br><br>Sobre:<br>Herencia y Liquidación de Comunidad de Bienes y Partición de Herencia |

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Mateu Meléndez, la Jueza Boria Vizcarrondo y el Juez Robles Adorno.

Boria Vizcarrondo, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 25 de marzo de 2026.

Comparece la señora Diana Ramos Octaviani t/c/c Diana Font (Sra. Ramos Octaviani o apelante), mediante un recurso de apelación, en el que nos solicita que revoquemos la *Sentencia Enmendada* emitida por el Tribunal de Primera Instancia (TPI), Sala Superior de San Juan, el 8 de octubre de 2025.[1] Mediante dicho dictamen, el foro primario declaró Ha Lugar la demanda de epígrafe; resolvió cuáles eran los bienes y las deudas del caudal; y denegó la reconvención presentada por la Sra. Ramos Octaviani. Además, decretó el archivo del caso contra la Junta de Directores del

---

[1] Sistema Unificado de Manejo y Administración de Casos (SUMAC) del TPI, Entrada Núm. 237. Notificada y archivada en autos el 9 de octubre de 2026.

Condominio La Cochera San Francisco, la señora Alida Font Polo y la licenciada María del C. Mulero, dado a que no se diligenciaron los emplazamientos de estos dentro del término provisto en la Regla 4.3(c) de Procedimiento Civil, 32 LPRA Ap. V, R. 4.3(c). Así, dictaminó el archivo del caso con perjuicio contra estos bajo la aludida regla. Por último, no le reconoció a la Sra. Ramos Octaviani derecho adicional al usufructo viudal, toda vez que heredó el tercio de la libre disposición.

Por los fundamentos que expondremos a continuación, se revoca la *Sentencia Enmendada* apelada a los únicos fines de identificar correctamente el préstamo personal de Oriental, y así se confirma.

**I.**

El caso de marras tiene su génesis el 3 de julio de 2018 cuando la señora Adrienne Font Wells y la señora Andrea Font Wells (en conjunto, parte apelada) radicaron una *Demanda* contra la Sra. Ramos Octaviani en concepto de herencia, liquidación de comunidad de bienes, y partición de herencia.[2] Estas adujeron ser las hijas del señor Augusto Font Polo (Sr. Font Polo), quien falleció el 25 de septiembre de 2017, y dejó un testamento abierto mediante la Escritura Número 4 otorgada el 21 de marzo de 2014 ante la notaria María Del C. Mulero Fernández (notaria Mulero Fernández). Arguyó la parte apelada del Sr. Font Polo que él las designó herederas de los tercios de la legítima estricta y del tercio de la mejora. Además, expusieron que el causante nombró a la Sra. Ramos Octaviani como albacea y heredera del tercio de la libre disposición.

De igual modo, alegaron en la demanda que el caudal hereditario estaba compuesto por una residencia localizada en la

---

[2] *Íd.*, Entrada Núm. 1; véase además, *Íd.*, Entradas Núms. 45 y 80.

Calle Cruz #57, San Juan, Puerto Rico; una propiedad inmueble adyacente a esta; una participación hereditaria de un 50% con relación a un inmueble que se encontraba en Caparra Heights; bienes muebles incluyendo un negocio llamado La Cochera de Viejo San Juan; derechos hereditarios de sus padres fallecidos; al igual que bienes y un negocio de manufactura de muebles localizados en Guatemala. Por tal razón, suplicaron del foro primario una serie de remedios incluyendo la preparación del inventario, avalúo, rendición de cuentas y trámite de relevo de hacienda; y la adjudicación de las participaciones correspondientes.

El 31 de agosto de 2018, la Sra. Ramos Octaviani presentó una *Contestación a la demanda.*[3] Aclaró que ella contrajo matrimonio con el Sr. Font Polo el 17 de marzo de 2016 bajo la Sociedad de Bienes Gananciales, y, por ende, como viuda, tenía derecho a recibir la cuota viudal usufructuaria. Además, expuso que presentó la planilla de contribución sobre caudal relicto ante el Departamento de Hacienda el 4 de diciembre de 2017, y la misma se encontraba bajo auditoría, ya que el Sr. Font Polo tenía deudas contributivas privativas. Asimismo, expuso que él tenía una participación hereditaria en un inmueble en Caparra Heights, empero no era titular del inmueble ubicado en la Calle Cruz #57, San Juan, Puerto Rico.

Luego de múltiples trámites procesales, el 1 de mayo de 2021, la Sra. Ramos Octaviani radicó una *Contestación a la demanda* con reconvención.[4] Con relación a la propiedad ubicada en la Calle Cruz #57, sostuvo que no era parte del caudal relicto, dado a que ella era dueña en pleno dominio de dicho inmueble. De igual modo, por medio de la reconvención, la Sra. Ramos Octaviani alegó tener unos créditos a su favor por las deudas privativas del Sr. Font Polo que

---

[3] *Íd.*, Entrada Núm. 7.
[4] *Íd.*, Entrada Núm. 85.

ella pagó; por deudas imputables a la Sociedad Legal de Gananciales desde la muerte del Sr. Font Polo; y por todas las deudas del caudal relicto de este que ella costeó.

Ulteriormente, el 28 de abril de 2022, el foro primario emitió una *Sentencia Parcial* en la que desestimó la demanda contra Cochera San Francisco, LLC por no ser parte indispensable.[5]

Los días 3 al 5 de febrero de 2025, el TPI celebró el Juicio en su Fondo donde varios testigos rindieron sus testimonios incluyendo la notaria Mulero Fernández.[6]

El 24 de julio de 2025, el foro *a quo* emitió una *Sentencia* por la que declaró Ha Lugar la demanda de marras; resolvió cuáles eran los bienes y las deudas del caudal; y declaró No Ha Lugar la reconvención de la viuda. Asimismo, ordenó el archivo del caso contra la Junta de Directores del Condominio La Cochera San Francisco, la señora Alida Font Polo y la notaria Mulero Fernández, ya que no fueron emplazados, conforme la Regla 4.3(c) de Procedimiento Civil, *supra*.[7] Además, le reconoció a la Sra. Ramos Octaviani el derecho al usufructo viudal.

Inconforme, la Sra. Ramos Octaviani y la parte apelada presentaron sus respectivas solicitudes de reconsideración el 12 de agosto de 2025 y el 14 de agosto de 2025.[8] En lo pertinente, la parte apelada arguyó en su oposición a la solicitud de reconsideración, que la Sra. Ramos Octaviani no presentó prueba para rebatir la presunción de gananciabilidad que cobijaba las deudas del Sr. Font Polo.

El 8 de octubre de 2025, el TPI emitió una *Resolución* por la que denegó la solicitud de reconsideración de la Sra. Ramos

---

[5] *Íd.*, Entrada Núm. 139. Notificada y archivada en autos el 3 de mayo de 2022.
[6] *Íd.*, Entradas Núms. 208-209, 211.
[7] *Íd.*, Entrada Núm. 220. Notificada y archivada en autos el 30 de julio de 2025.
[8] *Íd.*, Entradas Núms. 224, 226, 230 y 235.

Octaviani.[9] Sin embargo, conforme a la petición de la parte apelada, reconsideró parcialmente la *Sentencia* emitida el 24 de julio de 2025.

Consecuentemente, el foro primario emitió la *Sentencia Enmendada* apelada, ese mismo día, y no le reconoció a la Sra. Ramos Octaviani derecho adicional al usufructo viudal, toda vez que heredó el tercio de la libre disposición.[10]

Inconforme, la Sra. Ramos Octaviani presentó una *Reconsideración y determinaciones adicionales de hechos* el 24 de octubre de 2025,[11] la que fue *denegada* por el foro primario el 26 de octubre de 2025.[12]

Insatisfecha aun, la Sra. Ramos Octaviani presentó un recurso de apelación ante nos el 24 de noviembre de 2025 y expuso los siguientes señalamientos de error:

> **1. EL TPI ERRÓ DE PRIVAR A LA VIUDA APELANTE SU DERECHO AL USUFRUCTO VIUDAL COMO HEREDERA FORZOSA. <u>ARTÍCULO 736 CÓDIGO CIVIL, 31 LPRA §2362</u>[.]**
>
> **2. EL TPI ERRÓ AL DECIDIR QUE UNAS OBLIGACIONES SON GANANCIALES AL APLICAR RETROACTIVAMENTE LA PRESUNCIÓN DE GANANCIAL <u>31 LPRA 3647</u> A UNAS OBLIGACIONES DEL CAUSANTE SUSCRITAS Y CONSTITUIDAS EXCLUSIVAMENTE POR EL CAUSANTE, SOLTERO, ANTES DE EXISTIR EL MATRIMONIO Y ANTES DE EXISTIR LA SOCIEDAD DE GANANCIALES, Y CONTRARIO AL <u>ART</u>[.]<u> 3, 31 LPRA 3</u> QUE DISPONE QUE LAS LEYES NO TENDRÁN EFECTO RETROACTIVO[.]**
>
> **3. EL TPI ERRÓ AL TOMAR COMO CIERTAS LAS ALEGACIONES CONCLUSORIAS Y ESPECULATIVAS DE LA APELADA, EN LUGAR DE ATENERSE A LA EVIDENCIA OBJETIVA Y DOCUMENTAL DEL RÉCORD[.]**
>
> **4. EL TPI ERRÓ AL IGNORAR LA ENTERA FE Y CRÉDITO QUE POR LEY MERECEN LOS INSTRUMENTOS PÚBLICOS NOTARIALES[.]**
>
> **5. ERRÓ AL PRIVAR A LAS ESCRITURAS ESTIPULADAS Y OTORGADAS POR EL CAUSANTE Y**

---

[9] *Íd.*, Entrada Núm. 236. Notificada y archivada en autos el 9 de octubre de 2025.
[10] *Íd.*, Entrada Núm. 237. Notificada y archivada en autos el 9 de septiembre de 2025.
[11] *Íd.*, Entrada Núm. 238.
[12] *Íd.*, Entrada Núm. 239. Notificada y archivada en autos el 27 de octubre de 2025.

**LA APELANTE DE LA PRESUNCIÓN DE VALIDEZ, AUTENTICIDAD Y CORRECCIÓN QUE LAS AMPARA.**

**6. EL TPI ERRÓ AL IMPONER SOBRE LA APELANTE UN PESO PROBATORIO INEXISTENTE, Y AL ENTENDER QUE DEBÍA ACREDITAR — MEDIANTE RECIBOS O COMPROBANTES DE LOS ARREGLOS Y MEJORAS DURANTE VARIOS AÑOS AL HOGAR OCUPADO CONJUNTAMENTE CON EL CAUSANTE AUGUSTO COMO SU RESIDENCIA DESDE EL 1985 — CUYOS ARREGLOS Y MEJORAS CONSTAN DESCRITOS Y LISTADOS EN LAS ESCRITURAS ESTIPULADAS DE 2014.**

**7. EL TPI ERRÓ AL DECLARAR NULAS LAS ESCRITURAS ESC[.] 1 Y ESC[.] 2 DE 2014 ESTIPULADAS POR AMBAS PARTES Y ADMITIDAS EN EVIDENCIA POR FALTA DE PRECIO O ILICITUD DE CAUSA Y POR NO HABERSE PROBADO LA EXISTENCIA DE LAS CONTRAPRESTACIONES EN LAS ESCRITURAS ESTIPULADAS[.]**

Luego de darse por sometida la Transcripción de Prueba Oral sobre el Juicio en su Fondo celebrado ante el TPI los días 3 al 5 de febrero de 2025, la Sra. Ramos Octaviani presentó un *Alegato suplementario de la apelante* el 29 de enero de 2026.

Por su parte, la parte apelada radicó un *Alegato de la parte apelada* el 5 de febrero de 2026.

Contando con el expediente ante nos, al igual que el beneficio de la comparecencia de ambas partes, procedemos a disponer del presente recurso, no sin antes delimitar la normativa jurídica aplicable.

## II.

## A.

La Sociedad Legal de Gananciales comienza el día de la celebración del matrimonio y rige durante el matrimonio a falta de capitulaciones matrimoniales. Artículo 1267 del *"Código Civil de Puerto Rico" Edición de 1930*, 31 LPRA ant. sec. 3551; *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 901 (2016). Durante la existencia de esta sociedad, ambos cónyuges son codueños y coadministradores de la totalidad del patrimonio, sin una distinción de cuotas. *Montalván v. Rodríguez*, 161 DPR 411, 420 (2004).

El patrimonio matrimonial está compuesto por: "(1) los bienes adquiridos a título oneroso a costa del caudal común, (2) los obtenidos por la industria, el sueldo o el trabajo de los cónyuges y (3) los frutos, las rentas o los intereses percibidos o devengados durante el matrimonio de los bienes comunes o privativos". *Sucn. Rosado v. Acevedo Marrero, supra*, pág. 901. (Énfasis eliminado); Artículo 1301 del Código Civil de 1930, *supra*, ant. sec. 3641. Son de cargo a la sociedad de bienes gananciales los dispuestos en el Artículo 1308 del Código Civil de 1930*, supra*, ant. sec. 3661. Asimismo, durante la vigencia de la Sociedad Legal de Gananciales, existe una presunción rebatible de ganancialidad respecto a todos los bienes del matrimonio. Artículo 1307 del Código Civil de 1930, *supra*, ant. sec. 3647. Por tal razón, el peso de la prueba recae sobre quien sustente la naturaleza privativa. *García v. Montalvo Saldaña*, 107 DPR 319, 335 (1978).

A pesar de lo anterior, "el régimen de gananciales prevaleciente en nuestro ordenamiento reconoce, como axioma principal, el patrimonio individual de los cónyuges separado del de la sociedad". *Pujol v. Gordon*, 160 DPR 505, 512 (2003) (Énfasis eliminado). Un bien privativo es aquel que pertenece exclusivamente a un cónyuge. *Scotiabank v. TCG*, 198 DPR 158, 168 (2017). Según el Artículo 1299 del Código Civil de 1930, *supra*, ant. sec. 3631, son bienes propios de cada uno "(1) "Los que aporte al matrimonio como de su pertenencia. (2) Los que adquiera durante él, por título lucrativo, sea por donación, legado o herencia. (3) Los adquiridos por derecho de retracto o por permuta con otros bienes, pertenecientes a uno solo de los cónyuges. (4) Los comprados con dinero exclusivo de la mujer o del marido". (Énfasis omitido). Se consideran privativos también aquellos que tienen naturaleza personalísima. *Scotiabank v. TCG, supra*, pág. 168. Además de la antedicha lista, "hay bienes que por su naturaleza personalísima

son exclusivos de su titular, aunque para su consecución se hayan destinado fondos del caudal común o empleado la industria, el sueldo o el trabajo de uno o ambos cónyuges. Éstos están tan inextricablemente atados a las cualidades inmanentes a la persona, que no podrían ser calificados propiamente como 'gananciales' ". *Díaz v. Alcalá*, 140 DPR 959, 968-969 (1996). Ello ocurre, por ejemplo, con los grados académicos y las pensiones de retiro. *Sucn. Rosado v. Acevedo Marrero*, *supra*, pág. 902. En ese sentido, ambos cónyuges "tendrán el derecho de administrar y disponer libremente de sus respectivas propiedades particulares". Artículo 92 del Código Civil de 1930, *supra*, ant. sec. 285.

**B.**

Por otro lado, la Sociedad Legal de Gananciales se disuelve por muerte, divorcio o nulidad. *Sucn. Rosado v. Acevedo Marrero*, *supra*, pág. 901. Desde ese momento, ambos hacen suyos por la mitad las ganancias o los beneficios que hayan obtenido indistintamente por cualquiera de ellos durante el matrimonio. Artículo 1295 del Código Civil de 1930, *supra*, ant. sec. 3621. A esos efectos, al culminar dicha sociedad, se crea una comunidad de bienes postganancial hasta que se liquide o divida. *Cruz Pérez v. Roldan Rodríguez*, 206 DPR 261, 269 (2021). "Si a causa de la muerte de alguno de los excónyuges coexiste una comunidad hereditaria con una comunidad postganancial, primero debe liquidarse la comunidad postganancial". *Cruz Pérez v. Roldan Rodríguez*, *supra*, pág. 269. Una vez se disuelve el vínculo del matrimonio, cesa la presunción de gananciabilidad que establece el Artículo 1307 del Código Civil, *supra*, ant. sec. 3647. Las obligaciones que surjan posteriormente recaerán sobre su capital privativo. *Cruz Pérez v. Roldan Rodríguez, supra*, pág. 269.

Ahora bien, cuando el causante posee más de un heredero a título universal, se crea una comunidad hereditaria. *Miranda*

*Meléndez v. Registrador,* 193 DPR 862, 867 (2015). La herencia está compuesta por "todos los bienes, derechos y obligaciones de una persona, que no se extingan por su muerte". Artículo 608 del Código Civil de 1930, *supra,* ant. sec. 2090. En esta, los "herederos suceden al difunto por el hecho solo de su muerte, en todos sus derechos y obligaciones". Artículo 610 del Código Civil de 1930, *supra,* ant. sec. 2092. De igual modo, los herederos poseen la titularidad de una cuota alícuota o abstracta y no sobre un bien particular que se encuentre en el caudal relicto. *In re Torres Rivera,* 204 DPR 1, 14 (2020). De esta forma, "la sustitución del causante por su heredero constituye una continuación de su personalidad". *Torres, Torres v. Torres Serrano,* 179 DPR 481, 497 (2010). Previo a liquidar la sociedad es necesario determinar cuáles son los bienes privativos y gananciales. *LSREF2 Island Holdings, Ltd. Inc. v. Ashford R.J.F. Inc.,* 201 DPR 1026, 1035 (2019). "No es hasta la liquidación de la Comunidad de Bienes Postganancial, proceso que requiere la formación de un inventario, el avalúo y la tasación de los bienes, así como el pago de las obligaciones de la extinta sociedad de gananciales, que se puede dividir y adjudicar la ganancia o sobrante entre los excónyuges o sus correspondientes herederos". *LSREF2 Island Holdings, Ltd. Inc. v. Ashford R.J.F. Inc., supra,* pág. 1035. Luego de las deducciones con el propósito de satisfacer las obligaciones de la sociedad extinta y los gastos por pérdida o deterioro de los bienes ganaciales, el remanente constituye el capital de la comunidad de bienes. Artículo 1320 del Código Civil de 1930, *supra,* ant. sec. 3695; *LSREF2 Island Holdings, Ltd. Inc. v. Ashford R.J.F. Inc., supra,* pág. 1035. Ese sobrante se divide por mitad entre los excónyuges o sus respectivos herederos. Artículo 1322 del Código Civil de 1930, *supra,* ant. sec. 3697. Cuando coincidan una comunidad de bienes postganancial y una comunidad hereditaria, procede liquidar primero la comunidad de

bienes postganancial, y, luego, la hereditaria. *LSREF2 Island Holdings, Ltd. Inc. v. Ashford R.J.F. Inc.*, *supra*, pág. 1035.

## C.

La legítima es aquella "porción de bienes que el testador no puede disponer por haberla reservado la ley a determinados herederos, llamados por esto herederos forzosos". Artículo 735 del Código Civil de 1930, *supra*, ant. sec. 2361. A diferencia de los descendientes, no obstante, la cónyuge supérstite no hereda en pleno dominio de su porción, sino que posee un derecho a una cuota en usufructo. Artículo 761 del Código Civil de 1930, *supra*, ant. sec. 2411; *María Vicioso v. Suárez Noya*, 2026 TSPR 8. Ello se conoce como el usufructo viudal y constituye, en efecto, la legítima del cónyuge supérstite. *María Vicioso v. Suárez Noya, supra.* Por medio de este, "se busca amparar al cónyuge supérstite y evitar que, tras la muerte de su pareja, descienda de repente de la altura de su posición económica a un estado de pobreza". *María Vicioso v. Suárez Noya, supra.*

Cónsono con lo anterior, el usufructo viudal tiene varias protecciones. *María Vicioso v. Suárez Noya, supra.* Primero, "el cónyuge supérstite no puede ser preterido y puede solicitar el complemento de su legítima". *María Vicioso v. Suárez Noya, supra*; Artículo 742 del Código Civil de 1930, *supra*, ant. sec. 2368; Artículo 743 del Código Civil de 1930, *supra*, ant. sec. 2369. Segundo, a dicho cónyuge no se le puede privar por testamento de lo que le corresponde ni imponérsele carga o gravamen alguno. *Clavelo Pérez v. Hernandez García*, 177 DPR 822, 838 (2010). Tercero, dado a que el usufructo viudal es vital, no existe plazo ni condición posible más allá de la vida del cónyuge supérstite. *María Vicioso v. Suárez Noya, supra.* Cuarto, a la luz de su rango de heredero forzoso, el cónyuge supérstite debe concurrir a las operaciones particionales hasta que se le satisfaga o conmute su cuota. *María Vicioso v. Suárez Noya,*

*supra.* Quinto, "hasta tanto no suceda esa conversión, conmutación o satisfacción del usufructo viudal, todos los bienes de la herencia estarán gravados por el usufructo viudal". *María Vicioso v. Suárez Noya, supra*; Artículo 765 del Código Civil de 1930, *supra*, ant. sec. 2415.

Ahora bien, se busca dar cumplimiento a la voluntad del testador respecto a la disposición de sus bienes siempre y cuando no sea contrario a la ley. *Vilanova v. Vilanova,* 184 DPR 824, 858 (2012). De esta forma, "[l]o fundamental es que prevalezca la voluntad real del testador", pues constituye ley de la sucesión. *Moreda v. Rosselli,* 150 DPR 473, 482 (2000). Es decir, "[e]l rol judicial, en materia de interpretación testamentaria, consiste en descubrir esta voluntad a fin de que se produzcan en su día los efectos queridos por el testador dentro del marco permitido por ley". *Moreda v. Rosselli, supra,* pág. 480. "Toda disposición testamentaria deberá entenderse en el sentido literal de sus palabras, a no ser que aparezca claramente que fue otra la voluntad del testador. En caso de duda se observará lo que parezca más conforme a la intención del testador según el tenor del mismo testamento". Artículo 624 del Código Civil de 1930, *supra,* ant. sec. 2129. Es decir, el primer paso consiste en interpretar el testamento e inquirir la voluntad del testador conforme al propio texto de la disposición testamentaria. *Moreda v. Rosselli, supra,* pág. 481. "Cuando el texto es claro, allí ha de finalizar la interpretación testamentaria. La labor judicial resulta sencilla en estos casos". *Moreda v. Rosselli, supra,* pág. 481. Si luego de examinado el testamento, subsisten dudas sobre la antedicha voluntad será preciso recurrir a los medios de prueba *intrínsecos*; esto es, se debe observar lo que parezca más conforme a la intención del testador. *Moreda v. Rosselli, supra,* pág. 481. De agotarse esta etapa, empero todavía subsisten dudas sobre la voluntad del testador, es permitido

recurrir a medios de prueba *extrínseca*; es decir, acudiendo a "conductas, declaraciones o actos del testador que por definición se hallan fuera del testamento". *Moreda v. Rosselli, supra,* pág. 481. Algunos de los recursos extrínsecos que pueden ser utilizados para indagar la voluntad del testador son testamentos previos, cartas, hábitos y costumbres del testador. *Moreda v. Rosselli, supra,* pág. 482.

A pesar de lo anterior, "la interpretación de un testamento no puede tener el efecto de sustituir la voluntad declarada del testador por otra no declarada en lo absoluto" ni "se extiende a incluir lo no dicho y a dar por cumplido lo omitido". *Moreda v. Rosselli, supra,* pág. 482. Más importante aún, dicho foro reiteró que "cualquier legado hecho a la viuda del causante se entenderá hecho a cuenta de la legítima del cónyuge viudo, <u>a menos que</u> se desprenda del testamento la clara intención del causante de acumular la cuota vidual usufructuaria y el legado". *Moreda v. Rosselli, supra,* pág. 477 (Énfasis suplido); véase además, *Moreda v. Maruxa,* 141 DPR 674 (1996).

### D.

Es harto conocido que las obligaciones surgen de la ley, los contratos, los cuasicontratos, los actos, las omisiones o en que intervenga cualquier género de negligencia o culpa. Artículo 1042 del Código Civil de 1930, *supra,* ant. sec. 2992. En particular, las obligaciones que nacen de los contratos poseen fuerza de ley entre los contratantes. Artículo 1044 del Código Civil de 1930, *supra,* ant. sec. 2994. Para que exista un contrato es necesaria la concurrencia de los siguientes requisitos: (1) el consentimiento de los contratantes; (2) un objeto cierto que sea materia del contrato, y (3) que se establezca la causa de la obligación. Artículo 1213 del Código Civil de 1930, *supra,* ant. sec. 3391. Una vez concurren las condiciones esenciales para su validez, los contratos son

obligatorios. Artículo 1230 del Código Civil de 1930, *supra*, ant. sec. 3451. En particular, "la causa en los contratos es la razón o fin, o sea, el porqué de la obligación y --siguiendo la técnica de pregunta-- responde a la interrogante ¿por qué se debe?". *S.J. Credit, Inc. v. Ramírez*, 113 DPR 181, 186 (1982). "Los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral". Artículo 1227 del Código Civil de 1930, *supra*, ant. sec. 3432. Por tanto, un contrato puede resultar nulo *ab initio* si carece de alguno de los elementos necesarios para su constitución incluyendo la causa. *Rosario Rosado v. Pagán Santiago*, 196 DPR 180, 187 (2016).

## E.

El notario es aquel profesional del Derecho que "ejerce una función pública, autorizado para dar fe y autenticidad conforme a las leyes, de los negocios jurídicos y demás actos y hechos extrajudiciales que ante él se realicen, sin perjuicio de lo dispuesto en las leyes especiales". Artículo 2 de la *"Ley Notarial de Puerto Rico"* (Ley Notarial), Ley Núm. 75 del 2 de julio de 1987, según enmendada, 4 LPRA sec. 2002. Posee la función de "recibir e interpretar la voluntad de las partes, dándole forma legal, redactar las escrituras y documentos notariales a tal fin y conferirle autoridad a los mismos". Artículo 2 de la Ley Notarial, *supra*, sec. 2002. A su vez, "[l]a fe pública al notario es plena respecto a los hechos que, en el ejercicio de su función personalmente ejecute o compruebe y también respecto a la forma, lugar, día y hora del otorgamiento". Artículo 2 de la Ley Notarial, *supra*, sec. 2002; *In re González Pérez*, 2026 TSPR 2. En virtud de este principio de la fe pública notarial que viene llamado a llevar a cabo su ministerio con diligencia, esmero y estricto celo profesional. *In re Radinson Caraballo*, 2025 TSPR 71. En otras palabras, "la función que ejerce el notario va más allá de fungir como un autómata que legaliza las

firmas, ya que posee el deber de verificar que el instrumento público cumpla con todas las formalidades de la ley, que es legal y verdadero, y finalmente, que es una transacción legítima y válida". *In re Villanova Viera*, 206 DPR 360, 370 (2021). En ese sentido, "[e]l Estado le confiere al documento que autoriza un notario, bajo su firma, signo, sello y rúbrica, *una presunción de credibilidad y certeza* de que lo afirmado es cierto, correcto y concuerda con la realidad". *In re Collazo Sánchez*, 159 DPR 769, 774 (2003) (Énfasis suplido en el original). En cuanto a ese particular, "cuando un notario consigna hechos no veraces en una escritura, aun cuando no medie la intención de faltar a la verdad y solo sea una ausencia de diligencia o celo en su gestión notarial, este incurre en falta". *In re González Pérez, supra.* Es precisamente la " 'presunción de legalidad, veracidad y legitimidad lo que le brinda certeza, garantía y eficacia al documento notarial' ". *In re Pérez Pérez*, 2026 TSPR 3 (*citando a In re Vázquez Pardo*, 185 DPR 1031 (2012)). Por tanto, "[l]a fe pública notarial, espina dorsal del notariado, constituye una delegación del Estado y su quebrantamiento afecta directamente la confianza del ordenamiento jurídico". *In re Pérez Pérez, supra.*

### III.

En el caso de marras, nos toca dirimir si el foro primario incidió al privar a la Sra. Ramos Octaviani de su derecho al usufructo viudal; y al decidir que ciertas obligaciones eran gananciales en lugar de privativas del Sr. Font Polo. Por último, debemos resolver si el TPI erró al declarar nulas las escrituras número 1 y 2.

Según la *Sentencia Enmendada* apelada, el TPI resolvió que la Sra. Ramos Octaviani no tenía derecho adicional al usufructo viudal, dado a que heredó el tercio de la libre disposición. De igual modo, catalogó las siguientes deudas como gananciales:

(1) Contribuciones adeudadas al Departamento de Hacienda por $3,967.64[,]

(2) deuda por concepto de IVU por $429,

(3) deuda al IRS por seguro social por $20,119,

(4) patente al Municipio de San Juan por [$]42,607[,]

(5) tarjeta de crédito VISA de Banco Popular por $18,995.58,

(6) tarjeta de crédito Master Card de Banco Popular por [$]19,448.06,

(7) préstamo personal con Oriental Bank por $39,588.89,

(8) deuda con Cochera San Francisco LLC por adelantos en efectivo por $42,148 y,

(9) participación de 29.75% en la pérdida de operaciones de Cochera San Francisco LLC por $165,330.[13]

También resolvió que las escrituras número 1 y 2, otorgadas el 21 de marzo de 2014 ante la notaria Mulero Fernández, eran nulas por causa ilícita, y declaró los contratos nulos e inexistentes.

Inconforme, la Sra. Ramos Octaviani sostuvo como primer señalamiento de error que el foro primario incidió al privarla de su derecho al usufructo viudal como heredera forzosa, conforme el Artículo 736 del Código Civil de 1930, *supra*, ant. sec. 2362. Además, sostuvo bajo el segundo planteamiento de error que el TPI también erró al decidir que unas obligaciones eran gananciales cuando fueron suscritas por el Sr. Font Polo previo al matrimonio. De igual modo, expuso como tercer y cuarto señalamiento de error que incidió dicho foro al tomar como ciertas las alegaciones concluyentes y especulativas de la parte apelada, en lugar de atenerse de la prueba documental del récord; y al ignorar la entera fe y crédito que por ley merecen los instrumentos públicos notariales. Como quinto, sexto y séptimo planteamiento de error, arguyó la Sra. Ramos Octaviani que el TPI incidió al privar las

---

[13] *Íd.*, Entrada Núm. 237, pág. 17.

escrituras en cuestión de la presunción de validez, autenticidad y corrección; al solicitar de la Sra. Ramos Octaviani que debía acreditar los arreglos y mejoras que constaban descritos en las escrituras en cuestión; y al declarar nulas las escrituras número 1 y 2 por falta de precio y contraprestaciones, y/o por causa ilícita.

Por su parte, la parte apelada sostuvo que la notaria Mulero Fernández no corroboró el origen o razonabilidad del valor expresado en las escrituras ni la existencia de las alegadas obras. Expuso que la dación de fe notarial fue insuficiente para validar la causa expresada ni se probó causa lícita alguna. También arguyó que rebatió la presunción de gananciabilidad de las deudas y no existía una justificación en el testamento para que el foro primario le reconociera a la Sra. Ramos Octaviani un usufructo viudal adicional al tercio concedido.

Tras un análisis objetivo y cuidadoso, resolvemos que el foro primario incurrió en el segundo señalamiento de error, más no en los demás. Veamos.

Tal como expusimos anteriormente, "la interpretación de un testamento no puede tener el efecto de sustituir la voluntad declarada del testador por otra no declarada en lo absoluto" ni "se extiende a incluir lo no dicho y a dar por cumplido lo omitido". *Moreda v. Rosselli, supra*, pág. 482. Más importante aún, dicho foro reiteró que "cualquier legado hecho a la viuda del causante se entenderá hecho a cuenta de la legítima del cónyuge viudo, <u>a menos que</u> se desprenda del testamento la clara intención del causante de acumular la cuota vidual usufructuaria y el legado". *Moreda v. Rosselli, supra*, pág. 477 (Énfasis suplido); véase además, *Moreda v. Maruxa, supra*.

En el presente caso, el testamento abierto del Sr. Font Polo fue otorgado el 21 de marzo de 2014,[14] cuando él y la Sra. Ramos Octaviani no habían contraído matrimonio.[15] Según surge de dicho documento, el Sr. Font Polo solamente concedió a favor de ella el 1/3 de la libre disposición. Específicamente, dispuso lo siguiente:

> ----------**TERCIO DE LIBRE DISPOSICIÓN**--------------
> ---OCTAVO: En cuanto al tercio de libre disposición, EL TESTADOR nombra, designa e instituye como única heredera a su compañera Diana Ramos Octaviani, t/c/c Diana Font.----------------
> . . . .[16]

Aunque ambos se casaron en el año 2016, el fallecido <u>no realizó un testamento posterior a ese</u> con la intención de dejar a favor de la Sra. Ramos Octaviani la cuota usufructuaria más el legado de la libre disposición. Por ende, no se puede interpretar del testamento otorgado el 21 de marzo de 2014 que la voluntad del testador fue dejarle a ella el usufructo viudal más el tercio antedicho. En cambio, según el testamento, el tercio de la libre disposición era a cuenta de la legítima de la Sra. Ramos Octaviani. Por lo tanto, el <u>primer</u> señalamiento de error no se cometió.

Como pormenorizamos anteriormente, un bien privativo es aquel que pertenece exclusivamente a un cónyuge. *Scotiabank v. TCG, supra*, pág. 168. Según el Artículo 1299 del Código Civil de 1930, *supra*, ant. sec. 3631, son bienes propios de cada uno "(1) "Los que aporte al matrimonio como de su pertenencia. (2) Los que adquiera durante él, por título lucrativo, sea por donación, legado o herencia. (3) Los adquiridos por derecho de retracto o por permuta con otros bienes, pertenecientes a uno solo de los cónyuges. (4) Los comprados con dinero exclusivo de la mujer o del marido". (Énfasis omitido). Se consideran privativos también aquellos que tienen naturaleza personalísima. *Scotiabank v. TCG, supra*, pág. 168. En

---

[14] *Íd.*, Entrada Núm. 199, *Ex A Testamento y Certificación Odin*.

[15] *Íd.*, *Ex C Cerf Matrimonio*. La celebración del matrimonio fue el 17 de marzo de 2016; y su inscripción ocurrió el 31 de marzo de 2016.

[16] *Íd.*, *Ex A Testamento y Certificación Odin*, pág. 3.

ese sentido, los cónyuges "tendrán el derecho de administrar y disponer libremente de sus respectivas propiedades particulares". Artículo 92 del Código Civil de 1930, *supra*, ant. sec. 285.

Por otro lado, se consideran bienes gananciales "(1) Los adquiridos por título oneroso durante el matrimonio a costa del caudal común, bien se haga la adquisición para la comunidad, bien para uno solo de los esposos. (2) Los obtenidos por la industria, sueldo o trabajo de los cónyuges o de cualquiera de ellos. (3) Los frutos, rentas o intereses percibidos o devengados durante el matrimonio, procedentes de los bienes comunes o de los peculiares de cada uno de los cónyuges". Artículo 1301 del Código Civil de 1930, *supra*, ant. sec. 3641 (Énfasis omitido). Asimismo, son de cargo a la sociedad de bienes gananciales los dispuestos en el Artículo 1308 del Código Civil de 1930, *supra*, ant. sec. 3661. En esa misma línea, existe una presunción controvertible de gananciialidad, la que consiste en que se repuntan todos los bienes del matrimonio, siempre y cuando no se pruebe que pertenecen privativamente a uno de los cónyuges. Artículo 1307 del Código Civil de 1930, *supra*, ant. sec. 3647.

Según se desprende de la *Sentencia Enmendada* apelada, el foro primario realizó el siguiente resumen sobre los bienes y las deudas del caudal del Sr. Font Polo:

Activos:

(1) [L]a participación privativa del causante en la residencia de Caparra Heights por $30,000.00;

(2) $500.00 de la venta del auto privativo Mazda Miata Año 1990[;]

(3) $1,900.00 de la venta del auto privativo Chevrolet Silverado Año 2004[;]

(4) la participación privativa del causante de un 29.75% en Cochera San Francisco LLC. Cochera tasó $5,155,00.00[;]

(5) [r]esidencia en [la C]alle Cruz #57, Viejo San Juan en la que el causante tiene un 50% de participación.

Deudas gananciales:

(1) Contribuciones adeudadas al Departamento de Hacienda por $3,967.64[;]

(2) deuda por concepto de IVU por $429[;]

(3) deuda al IRS por seguro social por $20,119[;]

(4) patente al Municipio de San Juan por 42,607[;]

(5) tarjeta de crédito VISA de Banco Popular por $18,995.58[;]

(6) tarjeta de crédito Master Card de Banco Popular por 19,448.06[;]

**(7) préstamo personal con Oriental Bank por $39,588.89[;]**

(8) deuda con Cochera San Francisco LLC por adelantos en efectivo por $42,148 y[;]

(9) participación de 29.75% en la pérdida de operaciones de Cochera San Francisco LLC por $165,330.[17]

(Énfasis suplido).

Asimismo, el foro primario expuso que el ordenamiento jurídico partía de la presunción de gananciabilidad y le correspondía a la Sra. Ramos Octaviani presentar prueba suficiente para rebatirla. Empero, el TPI sostuvo que no tenía prueba demostrativa que las deudas se incurrieron previo al 17 de marzo de 2016. Sin embargo, de un examen cuidadoso de la *Planilla de Caudal Relicto*, surge que la deuda de Oriental pertenecía privativamente al Sr. Font Polo. En particular, dicha planilla dispone que el "PR[É]STAMO PERSONAL SIN GARANT[Í]A CON ORIENTAL BANK # PR[É]STAMO 11062010832-1 = $39,588.99" es un bien privativo.[18] Además, según se desprende del expediente, el Sr. Font Polo fue la única persona que firmó el *Pagaré* número 11062010832-1 de préstamo regular el 24 de diciembre de 2014.[19] Nadie más se obligó con dicho

---

[17] *Íd.*, Entrada Núm. 237, págs. 17-18.

[18] *Íd.*, Entrada Núm. 199, *Ex B Relevo y Planilla de Caudal Relicto*, pág. 9.

[19] *Íd.*, *Ex L Deuda Oriental bank de causante*, págs. 6-7.

banco. Más importante aún, el pagaré es del año 2014 cuando la Sra. Ramos Octaviani y el causante todavía no habían contraído matrimonio hasta el año 2016. Habiéndose demostrado que la deuda incurrida por dicho préstamo personal era privativamente del fallecido, incidió el foro primario en el segundo planteamiento de error; es decir, al determinar que era una obligación ganancial.

Por estar íntimamente relacionados, discutiremos los señalamientos de error tres al siete en conjunto. En esencia, la Sra. Ramos Octaviani impugnó la determinación del TPI declarando nulas las escrituras número 1 y 2.

En el presente caso, las escrituras número 1 y 2 versaban sobre la propiedad localizada en la Calle de la Cruz, la que estaba valorada en $200,000.00.[20] De acuerdo con la Escritura Número 1 sobre dación en pago, el Sr. Font Polo y la Sra. Ramos Octaviani adquirieron respecto a dicho inmueble sus respectivas participaciones pro-indivisas de un 50%.[21] Desde la adquisición de la propiedad, la Sra. Ramos Octaviani financió y realizó unos arreglos y unas mejoras al inmueble, totalizando una inversión de $79,000.00 con lo obtenido de la venta de sus obras de arte diseñadas y realizadas en Guatemala, y vendidas en Centroamérica. Surge de dicha escritura que el Sr. Font reconoció y aceptó el valor de la inversión, y reconoció un crédito por el 50% de su inversión que sumaba la cantidad de $39,500.00. De este modo, el Sr. Font Polo dio en pago a la Sra. Ramos Octaviani el equivalente a ese valor en la participación en la propiedad; es decir, un 19.75%. Así, el Sr. Font Polo se quedó con un 30.25% y la Sra. Ramos Octaviani con un 69.75%. Por su parte, la Sra. Ramos Octaviani aceptó dicha dación en pago.

---

[20] *Íd.*, *Ex D Esc 1 de 2014 Dación en Pago*, pág. 2; *Íd.*, *Ex E Esc 2 de 2014 Cv Participación*, págs 1-2.
[21] *Íd.*, *Ex D Esc 1 de 2014 Dación en Pago*, pág. 2.

Asimismo, por medio de la Escritura Número 2, la que también versa sobre la propiedad en la Calle de la Cruz, se expone que las:

-----------------**CLÁUSULAS Y CONDICIONES**----------------
---PRIMERA: EL VENDEDOR le VENDE, CEDE y TRASPASA todos sus derechos y acciones sobre la anterior descrita propiedad con todos sus usos, pero con las condiciones que acuerdan en el párrafo siguiente, a LA COMPRADORA, por el convenido precio de **SESENTA MIL QUINIENTOS DÓLARES**---------------
-------------------------------------------------------**($60,500.00).**
---Expresa EL VENDEDOR haber recibido con anterioridad a este acto la suma total de SESENTA MIL QUINIENTOS DÓLARES--------------------($60,500.00).
a través de múltiples pagos parciales en efectivo y cheques, del producto de la venta de las obras de arte diseñadas y realizadas en Guatemala y vendidas en Centroamérica por LA VENDEDORA-------------------------
---SEGUNDA: LA COMPRADORA acepta la venta, traspaso y enajenación que se relaciona en este instrumento público, sujeta a los acuerdos y estipulaciones consignados y advertencias por la Notario Fedante, **pudiendo ser algunas de dichas advertencias no aplicables al negocio jurídico que se efectúa en el presente instrumento público, y que se les ha explicado a los comparecientes todas las cláusulas, aquellas que aplican y las que no aplican.-**

. . . .[22]

(Énfasis suplido en el original).

Ahora bien, la notaria Mulero Fernández testificó lo siguiente sobre la Escritura Número 1 de dación en pago:

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

P Le pregunto si usted reconoce este documento.

R Claro que lo reconozco. Se otorgó ante mí.

P ¿En qué fecha?

R El 21 de marzo de 2014.

P ¿Y los otorgantes fueron el señor Augusto Font Polo y la señora Diana Ramos Octaviani?

R Eso es correcto.

P Okey. Le pregunto si aquí se expresa —estoy en la página 2 de la escritura...

R Ajá.

---

[22] *Íd., Ex E Esc 2 de 2014 Cv Participación*, págs. 2-3.

P ...hay una codificación, que entiendo es el número de catastro— y se expresa que la...

LCDO. JORGE L. GUERRERO-CALDERÓN:

¿Qué página?

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

¿Ah?

LCDO. JORGE L. GUERRERO-CALDERÓN:

¿Qué página, compañero?

VOZ NO IDENTIFICADA: "Ininteligible".

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

P Se expresa que la propiedad se valora en $200,000.00.

R Eso fue lo que me dijo el señor Augusto Font Polo y yo como notario recogí todo lo que él quiso que yo pusiera en ese documento. Y eso es lo primero.

**P ¿Usted sabe si se basó en alguna tasación de la propiedad?**

**R No, no sé.**

**P Que sepa, ¿no?**

**R Que sepa, ¿no?, pero fue él el que me dio ese valor y yo no tenía por qué cuestionarlo.**

P Okey. De igual manera, ¿él fue el que le dio 8 los valores de las...

R De todo. Él me dio toda la información.

P ¿Toda la información que está ahí?

R Toda la información vino d[e] Augusto Font Polo.

P Okey. Le pregunto si la expresión... El párrafo expositivo dos... Déjeme ver. Segundo, no era ese dos, el segundo.

R Ajá.

P Vamos a ver. Y se lo leo. Dice, "Desde que los comparecientes compraron la propiedad antes descrita, la segunda parte —se refiera a la señora Diana Ramos Octaviani— con el producto de venta de sus obras de arte diseñadas y realizadas en Guatemala y vendidas en Centroamérica, ha financiado y ha hecho los siguientes arreglos y mejoras a la propiedad".

R Ajá.

P Le pregunto si usted, en su oración de fe...

R. Ajá.

**P ...puede dar... tuvo alguna corroboración de esa expresión.**

**R Las palabras de Augusto Font Polo fueron para mí suficientes. Él fue el que me dio toda esa información. Una persona que conozco y que era buen amigo, muy amigo mío desde prin... desde mediados de los '90. Un hombre sumamente inteligente. Y él fue el que me dio toda esa información. Yo no tenía razón por la cual dudar de todo lo que me estaba diciendo.**

**P ¿Pero lo cierto es que no hubo ninguna corroboración?**

**R No. Su palabra para mí era suficiente. Y no hacía falta corroboración porque hace falta cuando uno está reclamando. Si yo le digo a usted, "Me tiene que pagar", le tengo que dar el recibo. Pero si yo estoy diciendo, "Yo le tengo que pagar a Fulano", no tengo que presentar recibo. La palabra es suficiente.**

. . . .[23]

(Énfasis suplido).

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

**P De la dación de fe de la realización de las obras, ¿usted puede dar fe de que esas obras se realizaron? La pregunta es, si usted da fe "ininteligible", ¿cuál es el alcance de su dación de fe?**

**R El alcance de mi dación de fe es lo que establece la escritura, que fue lo que dijo el señor Augusto Font y lo que estuvo... por lo que estuvo de acuerdo doña Diana.**

P ¿Y el valor fue lo mismo? ¿El precio de $200,000.00 el... la tasación?

**R Yo no estaba analizando lo que me decían para ver si estaba bien o estaba mal. Yo estaba recogiendo lo que él entendía como correcto y ella lo aceptó.**

. . . .[24]

(Énfasis suplido).

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

**P El párrafo segundo, de que esas obras o las diseñó o las financió la señora Diana Ramos Octaviani.**

---

[23] SUMAC del Tribunal de Apelaciones, Entrada Núm. 8, *Anejo #2 Amended Transcript - February 4, 2025*, pág. 154, L 25; págs. 155-156; pág. 157, L 1-18.
[24] *Íd.*, pág. 164, L 20-25; pág. 165, L 1-8.

LCDO. JORGE L. GUERRERO-CALDERÓN:

Sí, Su Señoría, está siendo repetitivo.

TESTIGO - LCDA. MARÍA DEL CARMEN MULERO FERNÁNDEZ:

¿Si es que es lo que dijo...

LCDO. EUFEMIO MARTÍNEZ-CINTRÓN:

P Sí.

R. ...Augusto?

**P. Sí. Pero le pregunto, si usted le recomendó o le preguntó si tenían algún tipo de documentación relacionada a ese, a esa manifestación.**

**R. ¿Algún tipo de qué?**

**P. Documentación.**

**R. No.**

. . . .[25]

(Énfasis suplido).

De igual modo, expuso la notaria Mulero Fernández lo siguiente respecto a la Escritura Número 2 sobre compraventa:

P No. Okey. Licenciada, ¿reconoce esa escritura?

R. Sí.

P ¿En qué fecha se firmó?

R. En el mismo día, 21 de marzo de 2014.

. . . .

P Le pregunto si - otra vez- se manifiesta que la propiedad se valora en $200,000.00.

R Sí.

**P Para esa segunda manifestación de $200,000.00, ¿hubo algún tipo de tasación?**

**R No.**

**P ¿O aplican las mismas contestaciones de la primera escritura?**

**R Exacto. Aplican exactamente las mismas contestaciones de la primera.**

---

[25] *Íd.*, pág. 165, L 24-25; pág. 166, L 1-14.

P Las escrituras están interrelacionadas, así que le pregunto, que se hace un reconocimiento relacionado con la Dación en Pago de la primera...

R Ajá.

P ...y se manifiesta que la segunda parte, que es la señora Ramos Octaviani, está comprando la participación del señor Augusto Font por la cantidad de $60,500.00.

R Ajá.

P Okey.

**R Sí. "Expresa —la escritura dice— expresa el vendedor haber recibido con anterioridad a este acto la suma total de $60,500.00, a través de múltiples pagos parciales en efectivo y cheques del producto de la venta de las obras de arte diseñadas y realizadas en Guatemala y vendidas en Centroamérica por "ininteligible"" [sic]. Le pregunto si usted vio alguno de esos cheques.**

**R No.**

**P ¿Usted tuvo algún recibo de alguna obra vendida?**

**R No.**

**R ¿Usted corroboró que en efecto se hubiera cumplido con la prestación?**

**R No.**

**P Con anterioridad al acto.**

**R De nuevo, Augusto establece que eso fue así y yo no tenía razón para dudar de su palabra.**

. . . .[26]

(Énfasis suplido).

De lo anterior se puede colegir que no se corroboraron los gastos ni quién los pagó. Nuestro máximo foro ha establecido que para que exista un contrato es necesaria la concurrencia de los siguientes requisitos: (1) el consentimiento de los contratantes; (2) un objeto cierto que sea materia del contrato, y (3) **que se establezca la causa de la obligación**. Artículo 1213 del Código Civil de 1930, *supra*, ant. sec. 3391. Una vez concurren las condiciones esenciales

---

[26] *Íd.*, págs. 166, L 15-19; pág. 167, L 9-25; pág. 168, L 1-21.

para su validez, los contratos son obligatorios. Artículo 1230 del Código Civil de 1930, *supra*, ant. sec. 3451. En particular, "la causa en los contratos es la razón o fin, o sea, el por qué de la obligación y --siguiendo la técnica de pregunta-- responde a la interrogante ¿por qué se debe?". *S.J. Credit, Inc. v. Ramírez, supra*, pág. 186. "Los contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral". Artículo 1227 del Código Civil de 1930, *supra*, ant. sec. 3432. Por tanto, un contrato puede resultar nulo *ab initio* si carece de alguno de los elementos necesarios para su constitución incluyendo la causa. *Rosario Rosado v. Pagán Santiago, supra*, pág. 188.

En esa misma línea, se presume que todo contrato contiene causa lícita, al menos que esa presunción sea destruida mediante prueba en contrario. *Díaz García v. Aponte Aponte*, 125 DPR 1, 10 (1989); *Ledesma Marrero v. Ledesma Marrero*, 84 DPR 167, 169 (1961). A esos efectos, nuestro más alto foro ha establecido que se va a entender que no medió precio ni su equivalente en los contratos cuando el notario no da fe sobre la entrega o si, por medio de la confesión de los contratantes respecto a que se verificó el mismo previamente, no se justifica dicho hecho. *Ledesma Marrero v. Ledesma Marrero, supra*, pág. 169. En particular, el otorgamiento de una escritura de compraventa el pago del precio no puede dejar lugar a dudas. *Díaz García v. Aponte Aponte, supra*, pág. 10. Es decir, " [n]o es 'suficiente la confesión de haberlo recibido, o que en la escritura conste su existencia, pues en ocasiones se finge ante el Notario una entrega que no es más que una farsa de los simulantes para engañarle' ". *Díaz García v. Aponte Aponte, supra*, pág. 10 (*citando a* M. Cárcaba Fernández, *La simulación en los negocios jurídicos*, Barcelona, Librería Bosch, 1986, pág. 58). Dicha exigencia responde a la necesidad de que el precio exista, pues, de lo contrario,

la venta sería simulada. *Díaz García v. Aponte Aponte, supra,* pág. 10.

En el caso de epígrafe, ciertamente, la parte apelada logró rebatir la corrección de ambas escrituras. Aunque la Escritura Número 1 versaba sobre dación en pago y la Escritura Número 2 sobre compraventa, ambas poseían el mismo fin. Es decir, que la intención de las escrituras fue venderle y cederle a la Sra. Ramos Octaviani los derechos y parte de la participación del Sr. Font Polo respecto al inmueble en cuestión, a cambio del supuesto producto que obtuvo la Sra. Ramos Octaviani de la venta de las obras de arte. Sin embargo, la notaria Mulero Fernández no corroboró la información incluida en ambos instrumentos públicos ni se desprendieron del expediente documentos que probaran las mejoras realizadas a dicho inmueble, los pagos ni de dónde procedió el dinero que presuntamente la Sra. Ramos Octaviani utilizó para costear las mejoras. Por tal razón, determinamos que el foro primario no incidió al determinar que la causa de ambas escrituras era ilícita, y, por ende, al carecer de uno de los elementos necesarios para su constitución, los contratos eran nulos. *Rosario Rosado v. Pagán Santiago, supra,* pág. 187.

**IV.**

Por las razones discutidas anteriormente, se revoca la *Sentencia Enmendada* apelada a los únicos fines de identificar como privativo el préstamo personal de Oriental, y así modificada, se confirma en lo demás. En su consecuencia, devolvemos el caso para que el foro primario proceda a establecer nuevamente los bienes y las deudas del caudal del Sr. Font Polo, conforme lo aquí resuelto.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones